UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO GOLF PARTNERS, INC., | Case No. 1:14-cv-00233-BLW |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| TIMBERSTONE MANAGEMENT, LLC., | |
| Defendant. | |
| TIMBERSTONE MANAGEMENT, LLC., | |
| Counterclaimant, | |
| v. | |
| IDAHO GOLF PARTNERS, INC., | |
| Counterdefendant. | |

## INTRODUCTION

This case concerns a trademark dispute between two golf courses over the use of

the mark "TIMBERSTONE." Plaintiff-Counterdefendant Idaho Golf Partners, Inc.

("IGPI") operates a golf course in Caldwell, Idaho under the assumed business name

"TimberStone Golf Course." Defendant-Counterclaimant TimberStone Management,

LLC ("TimberStone Management") operates the "TimberStone Golf Course" in Iron

Mountain, Michigan. On June 13, 2014, IGPI filed a complaint alleging a claim for tortious interference with prospective economic advantage, seeking a declaratory judgment that TimberStone Management does not own an exclusive right to the TIMBERSTONE mark, and seeking to enjoin TimberStone Management from interfering with its use of the mark. TimberStone Management asserted counterclaims for trademark infringement (15 U.S.C. § 1114), unfair competition and false designation of origin (15 U.S.C. § 1125(a)), trademark dilution (15 U.S.C. § 1125(c)), and cybersquatting (15 U.S.C. § 1125(d)).

Trial in this case took place from September 26 to September 30, 2016 on TimberStone Management's counterclaims. The parties' claims for injunctive and declaratory relief were reserved for the Court. The jury returned a verdict for TimberStone Management on its counterclaims for trademark dilution and unfair competition and false designation of origin, and awarded $9,808 in damages against IGPI. Additionally, the jury found that IGPI acted willfully, maliciously, or fraudulently. The jury found no trademark infringement or cybersquatting by IGPI.

Both parties filed omnibus post-trial briefs, addressing their equitable claims and post-trial motions Dkts. 122, 123. These include (1) IGPI's motion for judgment as a matter of law, or alternatively for a new trial, on the trademark dilution and unfair competition and false designation of origin counterclaims; (2) IGPI's request for a declaratory judgment; (3) TimberStone Management's motion to enhance the jury's damages award; (4) TimberStone Management's motion for attorneys' fees and costs; (5)

TimberStone Management's motion for a permanent injunction.

A hearing was held on the post-trial motions on November 30, 2016. At the conclusion of that hearing, the Court requested supplemental briefing on the following issues: (1) whether the Court can consider an issue not specifically raised in a Rule 50(a) motion, but later presented in a Rule 50(b) motion, in order to avoid plain error; (2) whether a statutory or common law "good faith remote use" defense applies to an unfair competition claim under 15 U.S.C. § 1125(a); (3) whether, even if applicable, a prior use defense on the unfair competition claim was waived when IGPI failed to ask for an instruction on that defense; and (4) whether the Ninth Circuit has held in any post-2006 case that "fame" may exist in niche market.

This memorandum opinion and order addresses the parties' post-trial motions. The Court will issue a separate decision addressing their requests for equitable relief.

## LEGAL STANDARD

### A.    Rule 50 – Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a request for a judgment as a matter of law. Under Rule 50(a), a party must first move for judgment as a matter of law before the case is submitted to the jury and "specify . . . the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if the court denies the pre-verdict motion, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The failure to make a Rule 50(a) motion before the case is submitted to the

jury forecloses the possibility of the Court later considering a Rule 50(b) motion. *Tortu v. Las Vegas Metropolitan Police Dep't.*, 556 F.3d 1075, 1083 (9th Cir. 2009). Furthermore, "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b), 1991 advisory committee notes.

A court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (citing *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). "A jury's verdict must be upheld if it is supported by substantial evidence . . . , even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *Go Daddy Software, Inc.*, 581 F.3d at 961 (quoting *Reeves*, 530 U.S. at 150). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id.*

### B.    Rule 59 - Motion for New Trial

Federal Rule of Civil Procedure 59(a)(1) states, "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."

"Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the [clear] weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Erroneous or inadequate jury instructions are also bases for a new trial. *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

A verdict is against the "clear weight of the evidence" when, after giving full respect to the jury's findings, the judge "is left with the definite and firm conviction that a mistake has been committed" by the jury. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987) (citations omitted). In ruling on a motion for new trial, "the judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Air–Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 190 (9th Cir. 1989) (citations and quotation marks omitted). However, a court should not upset the verdict "merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted).

## ANALYSIS

### 1.    IGPI's Motion for Judgment as a Matter of Law under Rule 50(b)

At the close of TimberStone Management's case in chief, IGPI made a Rule 50(a) motion for judgment as a matter of law. The Court denied the motion and the case was

submitted to the jury. IGPI now renews its motion for judgment as a matter of law pursuant to Rule 50(b), asserting that there was insufficient evidence as to: (1) TimberStone Management's trademark dilution claim; (2) TimberStone Management's unfair competition claim; (3) the jury's finding that IGPI infringed TimberStone Management's marks maliciously, fraudulently, or willfully; (4) actual damages.

### A.     Procedural Default

As a threshold matter, TimberStone Management argues that IGPI is procedurally barred from asserting the first three grounds for its Rule 50(b) motion because IGPI failed to preserve these arguments. The Court agrees.

Under Rule 50(a), a pre-verdict motion for judgment as a matter of law must "specify . . . the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). "Because it is a *renewed* motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); Fed. R. Civ. P. 50(b) Adv. Comm. Notes 2006.[1]

---

[1] The purpose of this preservation requirement is to protect the Seventh Amendment right to trial by jury and to provide notice of the alleged deficiencies at a time when the opposing party still has time to correct them. *See Waters v. Young*, 100 F.3d 1437, 1441 (9th Cir. 1996) (quoting Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment). Judge Carnes of the Eleventh Circuit articulated the purpose of this rule in more colorful terms:

A Rule 50(a) motion must be made . . . on terms sufficient to alert the opposing party and the

The Ninth Circuit strictly construes this limitation. *See Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (district court erred in granting JMOL on punitive damages where defendant failed to raise the argument in its Rule 50(a) motion). In fact, courts generally require sufficiency-of-the-evidence arguments to be made at the level of a claim's specific elements or sub-elements. *See id.*; *accord Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998) ("The JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported. A generalized challenge is inadequate.") (internal quotations and citations omitted).

Applying this standard here, the Court determines that IGPI failed to preserve the sufficiency of the evidence challenges on the trademark dilution and unfair competition claims. Counsel for IGPI made the following oral motion under Rule 50(a) for judgment as a matter of law at the conclusion of TimberStone Management's case-in-chief:

> I don't believe TimberStone Management has satisfied its prima facie showing on the myriad of claims, trademark, infringement, both under the Lanham Act and common law.
>
> Particularly, though, I guess I would like to talk about two issues, and that is the cybersquatting. I don't think there has been any evidence of bad faith in connection with that. There has been a lot of talk about should have, would have, could have, mistakes, but nothing that would rise to the level of bad faith.
>
> The other issue is with respect to the intentional interference claim, there is no evidence of actual damages. And that intentional interference claim is a state-law claim, and it's separate and apart from the Lanham Act and statutory damages, and

court of the ground for the motion. Otherwise, a sly movant, discerning a deficiency in his adversary's presentation of the evidence, could lie in wait . . . until after a verdict when it would then be too late for the adversary to correct what might have been a readily fixable omission.

*McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1265 (11th Cir. 2016) (J. Carnes, dissenting).

> disgorgement of profits, those sorts of things. There is simply no evidence of actual damages being presented to the court that would warrant submitting any claim with reference to actual damages but particularly that intentional interference claim, Your Honor. And that's all. I understand the court's position.

*Partial Transcript for Sept. 30, 2016*, at 5:2–21, Dkt. 127. IGPI did not file a brief in support of its motion. The Court denied the motion and the case was submitted to the jury.

After a careful review of the transcript, the Court concludes that IGPI's oral Rule 50(a) motion challenged the sufficiency of the evidence on only two issues: (1) "bad faith," an element of TimberStone Management's cybersquatting claim, and (2) actual damages. In contrast, IGPI's Rule 50(b) motion asserts that there was insufficient evidence on the following issues: (1) "famousness" of TimberStone Management's mark, an element of the trademark dilution claim; (2) "likelihood of confusion," an element of the unfair competition claim; (3) fraud, malice, and willfulness; and (4) actual damages. Of these, the only argument expressly raised in the pre-verdict motion was evidence of actual damages.

IGPI contends that the remaining arguments were adequately preserved for three reasons. First, the opening line of its oral pre-verdict motion presented a comprehensive sufficiency-of-the-evidence challenge to the "myriad of [Defendant's] claims." Second, IGPI notes that the Court had previously stated its intention to deny the motion. Finally, TimberStone Management and Court were aware of IGPI's more specific grounds for the Rule 50 motion, due to off-the-record discussions and the fact that "Plaintiff has consistently and repeatedly, throughout this litigation raised the same exact arguments as

to the sufficiency of Defendant's evidence."

The Court is not persuaded by these arguments. First, the opening line of IGPI's motion—"I don't believe TimberStone Management has satisfied its prima facie showing on the myriad of claims"—falls far short of the specificity required by Rule 50. *See* Fed. R. Civ. P. 50(a)(2) (a Rule 50(a) motion "must specify . . . the law and facts that entitle the movant to the judgment."). Courts have stressed that a pre-verdict motion must bring into focus the precise claims that a movant contends are insufficiently supported; a generalized challenge as to "the myriad of claims" fails to do so. Permitting this sort of all-encompassing motion would eviscerate the preservation requirement.

As for the second argument, the failure to comply with Rule 50(b) has on occasion been excused where a district court prevents or discourages a party from fully presenting its pre-verdict motion. For example, in *Reeves v. Teuscher*, 881 F.2d 1495 (9th Cir. 1989), the Ninth Circuit excused technical noncompliance with Rule 50, where the district court interrupted defense counsel's attempt to move for a directed verdict at the close of evidence and instructed counsel to move *after* the verdict—which he did. Similarly, in *Motorola, Inc. v. Interdigital Tech. Corp.*, 930 F. Supp. 952, 961 (D. Del. 1996), *rev'd in part on other grounds*, 121 F.3d 1461 (Fed. Cir. 1997), the district court had "made clear that it did not require or desire additional argument at the time the [Rule 50(a)] motion was made" and therefore concluded that "it would be unfair to penalize ITC for acceding to the Court's wishes." In contrast here, the Court prompted IGPI to make its Rule 50(a) motion on the record before the case was submitted to the jury. It did

not request or encourage a merely perfunctory argument. *See Partial Transcript for Sept. 30, 2016*, at 4:8. Counsel's knowledge that the motion would likely be denied did not excuse his obligation to carefully preserve IGPI's arguments.

Finally, the Court finds no support for the notion that off-the-record discussions may fulfill the preservation obligations under Rule 50. Ultimately, "[a] lawyer has a duty to preserve issues on the record for his client." *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 159–60 (4th Cir. 2012). Counsel for IGPI failed to do so here. The Court also advised counsel for IGPI that any arguments made at the jury instruction conference should be restated on the record in a proper Rule 50(a) motion, and provided time for IGPI to do so. Counsel took this opportunity to challenge the sufficiency of the evidence on two specific claims, giving the impression that IGPI did not intend to pursue arguments about unproven elements of other claims. Even if IGPI had previously maintained that evidence of fame, likelihood of confusion, and fraud, malice, and willfulness was lacking, these arguments were abandoned.

Accordingly, the Court concludes that IGPI is procedurally barred from obtaining judgment as a matter of law, except on the sufficiency of the evidence of damages. The Court takes up this argument below in the comprehensive discussion on damages.

**2.    IGPI's Motion for New Trial under Rule 59**

As an alternative to its request for judgment as a matter of law, IGPI requests a new trial on grounds that the jury verdict was against the weight of the evidence. The Court will grant the motion for a new trial as to the trademark dilution claim and

otherwise deny the motion.

### A.    *Trademark Dilution*

To prevail on a claim for trademark dilution under the Trademark Dilution
Revision Act ("TDRA") of 2006, 15 U.S.C. § 1125(c), a party must show that its mark is
"famous," meaning that "it is widely recognized by the general consuming public of the
United States as a designation of source of the goods or services of the mark's owner." 15
U.S.C. § 1125(c)(2)(A). "It is well-established that dilution fame is difficult to prove."
*Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012).
Protection from dilution, as opposed to trademark infringement, is "reserved for a select
class of marks— . . . only those whose mark is a 'household name.'" *Nissan Motor Co. v.
Nissan Computer Corp.,* 378 F.3d 1002, 1011 (9th Cir. 2004) (quoting *Thane Int'l., Inc.
v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002) ("[T]he mark must be a
household name."); *see also* H.R. Rep. No. 104–374, at 3 (1995) (listing Dupont, Buick,
and Kodak as examples of eligible "famous marks").

To determine the requisite degree of fame, the court may consider all relevant
factors, including those four enumerated by statute: (i) the duration, extent, and
geographic reach of advertising and publicity of the mark; (ii) the amount, volume, and
geographic extent of sales of goods or services offered under the mark; (iii) the extent of
actual recognition of the mark; and (iv) whether the mark was registered. 15 U.S.C. §
1125(c).

### (1)    Application of Statutory Factors

Applying this standard here, the Court concludes that TimberStone Management presented insufficient evidence to support the jury's finding that the TIMBERSTONE mark is "famous" within the meaning of the TDRA. As for the first statutory factor, TimberStone Management's advertising and promotional efforts were limited in scope. The company's own Director of Marketing, Tyler Swanson, described his marketing budget as "extremely low." The company's efforts appear limited to passively maintaining its website and social media accounts, fairly ubiquitous marketing in today's economy. TimberStone Management presented no evidence that it has purchased advertisements or otherwise promoted its brand. These modest efforts pale in comparison to the dollars spent advertising truly famous marks, and even those held not famous. *See, e.g.*, *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1013 (9th Cir. 2004) (upholding lower court's finding that a material dispute of fact existed regarding whether NISSAN was a famous mark, despite evidence of more than $898 million in advertising expenditures); *Jada Toys v. Mattel, Inc.*, 518 F.3d 628 (9th Cir. 2007) (concluding that HOT WHEELS was sufficiently famous, where $350 million was spent advertising the mark); *Nike, Inc. v. Nikepal Int'l, Inc.*, No. 2:05–CV–1468–GEB–JFM, 2007 WL 2782030, at *5–6 (E.D. Cal. Sept. 18, 2007) (NIKE mark was sufficiently famous, where the company spent in excess of $1 billion on promotion); *Bd. of Regents, Univ. of Texas Sys.*, 550 F.Supp.2d at 677–78 (W.D. Tex. 2008) (University of Texas longhorn logo was not famous, despite its promotion at nationally televised football games on ABC and ESPN, on the cover of Sports Illustrated, on cereal boxes, and on $400 million in UT

retail products).

As for publicity, the Michigan course has received accolades in publications with nationwide distribution, such as GolfDigest and Golfweek. It was also featured on multiple "best of" lists and enjoyed a five-star rating from GolfDigest in 2004 and 2008. However, these articles were too few to have transformed TIMBERSTONE into a household name. "Many products receive broad incidental media coverage. Such promotion does not lead to the conclusion that their trademarks have become a part of the collective national consciousness." *Thane Int'l Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 912 (9th Cir.2002). The impact of such publications is also lessened by the fact that the TimberStone course of Michigan was almost always listed alongside dozens or even hundreds of other golf courses achieving similar reviews. *See, e.g.*, *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1375 (Fed. Cir. 2012) (substantial media references failed to show widespread recognition of COACH brand where "many of the references are limited to mentioning one of CSI's COACH products among other brands.").

The amount, volume, and geographic extent of sales provide similarly weak support for a finding of fame. While TimberStone Management has sold rounds of golf to customers from almost every state, most came from Michigan and adjacent states. Joe Rizzo, former Director of Golf at TimberStone Management, testified that these states are the golf course's "target area" and that 90-95% of customers drive to the course. Moreover, TimberStone Management's sales number only in the tens of thousands, and

golf is the type of activity that is likely to draw a significant number of repeat customers. TimberStone Management provided no evidence of the number of unique customers that had purchased a round of golf from its course. Moreover, its sales volume pales in comparison to that of truly famous marks. *See, e.g.*, *Jada Toys, Inc.*, 518 F.3d at 635 (three billion units sold supported finding that HOT WHEELS was famous).

Finally, and most importantly, there is no evidence of actual recognition of the TIMBERSTONE mark in the general public,[2] such as "press accounts about the popularity of the brand, or pop-culture references involving the brand[.]" *Thane*, 305 F.3d at 912. Survey evidence or market research demonstrating widespread brand awareness, or the lack thereof, weighs heavily in determining a mark's fame.[3] TimberStone Management did not submit any such surveys or polls. Even if it had, the leading treatise on trademark law recommends "that a minimum threshold survey response should be in the range of 75% of the general consuming public of the United States." 4 McCarthy on Trademarks § 24:106 (4th ed.) (footnotes omitted). There is nothing in the record to suggest that the TIMBERSTONE's recognition is so pervasive even in the niche golf market.

As for the final factor, whether the mark was registered, the fact that

---

[2] TimberStone Management presented testimony of one individual, Lisa Largent, who resided outside Michigan and had golfed its course. However, Ms. Largent is herself an avid golfer and has family in Michigan. Her knowledge of the course does not establish actual recognition of the TIMBERSTONE mark among the general consuming public.

[3] TimberStone Management cites to several cases assessing the usefulness of survey evidence to establish "dilution," a separate element of a trademark dilution claim. *See Pl. Br.* These cases are entirely inapposite for the purposes of the "fame" analysis. Survey evidence serves a distinct and critical function in establishing a mark's fame.

TIMBERSTONE is a registered mark does not add meaningfully to its assertion of fame. As the leading commentator notes, "[o]ne cannot logically infer fame from the fact that a mark is one of the millions on the federal Register." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:106, at 24-293 (4th ed.).

For these reasons, the court is firmly convinced that the jury verdict in favor of TimberStone Management on its trademark dilution claim was against the great weight of the evidence. The evidence of "fame," an essential component of trademark dilution, was simply insufficient to find that the TIMBERSTONE mark is "widely recognized by the general consuming public of the United States."

### (2)     Niche Fame

TimberStone Management argues that its mark achieved sufficient fame to support its dilution claim because its mark is famous within the "niche" golfing market. The Ninth Circuit did endorse a concept of "niche" fame in *Thane International, Inc. v. Trek Bicycle Corporation*, 305 F.3d 894 (9th Cir. 2002). However, *Thane* was decided under the then-governing FTDA, which contained no requirement of "wide[] recogni[tion] by the general consuming public." That language, added in the 2006 amendments to federal anti-dilution law, clearly precludes recognition in a niche industry, region, or market segment. *See* 15 U.S.C. § 1125(c)(2)(A).

In fact, the House Report accompanying the Trademark Dilution Act of 2006 states that the legislation was intended to eliminate the "niche" fame concept adopted in certain circuits. *See* House Report on Trademark Dilution Act of 2006, H.R. Rep. 109-23

at 8 ("[T]he legislation expands the threshold of 'fame' and thereby *denies protection for marks that are famous only in 'niche' markets*.") (emphasis added); *id.* at 25 (statement of the Honorable Howard L. Berman) ("This bill narrows the application of dilution by tightening the definition of what is necessary to be considered a famous mark. *The bill eliminates fame for a niche market*.") (emphasis added).

TimberStone Management refers the Court to cases it suggests still allow for a claim of fame in a "niche" industry under the 2006 amendments. These cases either failed to reach the "fame" issue,[4] involved state law dilution claims lacking a "fame" requirement,[5] found sufficient evidence of nationwide fame among the general public,[6] or relied exclusively on pre-2006 circuit case law without careful attention to the legislative change.[7] The overwhelming majority of courts have rejected the concept of "niche" fame since the passage of the 2006 amendments.[8] None have concluded that

---

[4] *See Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1033–37 (9th Cir. 2007); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 247 (2d Cir. 2009).

[5] *See American Century Proprietary Holdings, Inc. v. American Century Casualty Co.*, 295 F. App'x 630, 639 (5th Cir. 2008) (applying the Texas anti-dilution statute, which includes a lesser requirement of distinctiveness, not fame); *Gruma Corp. v. Mexican Rests., Inc.*, 497 F. App'x 392, 400 (5th Cir. 2012) (same); *Russell Rd. Food & Bev., LLC v. Galam*, No. 2:13-cv-00776-RFB-NJK, 2016 U.S. Dist. LEXIS 50354, at *39-40 (D. Nev. Apr. 13, 2016) (applying Nevada's anti-dilution statute)

[6] In *Gerawan Farming, Inc. v. Prima Bella Produce, Inc.*, No. CV F 10-0148 LJO, 2011 U.S. Dist. LEXIS 84776, at *77-79 (E.D. Cal. Aug. 2, 2011), for example, the court determined that there was sufficient evidence of fame of PRIMA produce to withstand summary judgment, where PRIMA was sold in major grocery stores, the label was advertised "aggressively" on fruit stickers and packaging, and a New York fruit buyer testified that customers "ask for the PRIMA brand."

[7] *See US Risk Ins. Group, Inc. v. United States Risk Management, LLC*, 2013 WL 4504754 (N.D. Tex. Aug. 20, 2013) (citing a 2001 Fifth Circuit case suggesting the niche fame is sufficient, and concluding only that a fact issue existed as to fame); *Zinn v. Seruga*, No. 05-3572 (GEB 2009 WL 3128353, at *29-30 (D.N.J. Sept. 28, 2009) (citing a 2000 Third Circuit opinion suggesting that niche fame is sufficient).

[8] *See, e.g., Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012) (TDRA eliminated the possibility of "niche fame" as supporting a dilution claim); *Paleteria La*

*Thane*'s "niche" fame standard survived the change in law. Thus, the Court cannot accept TimberStone Management's position that recognition in a niche market will suffice to establish fame.

### (3) Degree of Recognition Required

TimberStone Management next argues that even if "niche" fame will not suffice, a mark need not rise to the level of a "household name" to be deemed famous. This position is untenable, given the Ninth Circuit's use of that precise language. *See Nissan Motor,* 378 F.3d at 1011 ("[T]he FTDA extends dilution protection only to those whose mark is a 'household name.'"); *Thane International*, 305 F.3d at 911 ("[T]he mark must be a household name.").

Moreover, the authorities cited by TimberStone Management do not suggest that the TIMBERSTONE mark enjoys recognition comparable to other marks deemed famous. Two of the cited cases were resolved without any discussion of fame. *See*

---

*Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F. Supp. 3d 175, 220 (D.D.C. 2014) ("'[N]iche fame' . . . is insufficient as a matter of law to maintain a dilution claim."); *Urban Home, Inc. v. Cordillera Inv. Co., LLC*, No. CV 13-08502 GAF JEMX, 2014 WL 3704031, at *6 (C.D. Cal. June 19, 2014) ("The trademark dilution statute was revised in 2006 to deny protection to marks whose fame extends only to niche markets"); *Leapers, Inc. v. SMTS, LLC d/b/a Tuff Zone, TRARMS, Inc.*, 2014 U.S. Dist. LEXIS 140622, *10, 2014 WL 4964376 (E.D. Mich. Oct. 3, 2014) ("'niche fame' is insufficient to obtain protection against trademark dilution."); *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1061 n.1 (D. Or. 2008) ("Specific changes to federal dilution law under the TDRA include: . . . a rejection of dilution claims based on 'niche' fame."); *Bd. of Regents, Univ. of Tex. Sys. v. KST Elec., Ltd.*, 550 F.Supp.2d 657, 679 (W.D. Tex. 2008) ("One of the major purposes of the TDRA was to restrict dilution causes of action to those few truly famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like."); *Dan–Foam A/S v. Brand Named Beds, LLC*, 500 F.Supp.2d 296, 307 n. 90 (S.D.N.Y. 2007) (concluding that the TDRA "was intended to reject dilution claims based on niche fame, i.e. fame limited to a particular channel of trade, segment of industry or service, or geographic region."); *see also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 24:104.

*Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1033–37 (9th Cir. 2007); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 247 (2d Cir. 2009). Two involved state law dilution claims lacking a "fame" requirement. *See American Century Proprietary Holdings, Inc. v. American Century Casualty Co.*, 295 F. App'x 630, 639 (5th Cir. 2008) (applying the Texas anti-dilution statute, which includes a lesser requirement of "distinctiveness"); *Gruma Corp. v. Mexican Rests., Inc.*, 497 F. App'x 392, 400 (5th Cir. 2012) (same). The final case dealt with a brand with substantially more nationwide fame than TIMBERSTONE. *See Gerawan Farming, Inc. v. Prima Bella Produce, Inc.*, No. CV F 10-0148 LJO, 2011 U.S. Dist. LEXIS 84776, at *77-79 (E.D. Cal. Aug. 2, 2011) (finding sufficient evidence of fame of PRIMA produce to withstand summary judgment, where PRIMA was sold in major grocery stores, the label was advertised "aggressively" on fruit stickers and packaging, and a New York fruit buyer testified that customers "ask for the PRIMA brand.").

In fact, brands with far greater recognition than TIMBERSTONE are routinely found to lack sufficient fame to qualify for protection from dilution. *See, e.g.*, *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1376 (Fed. Cir. 2012) (COACH high-end handbags and leather goods); *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911-912 n.14 (9th Cir. 2002) (TREK bicycles); *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671, 698 (W.D. Ky. 2010) (MAKER'S MARK trade dress of red dripping wax); *Blue Man Productions, Inc. v. Tarmann*, 75 U.S.P.Q.2d 1811, 2005 WL 2034544 (T.T.A.B. 2005) (BLUE MAN GROUP

entertainment group); *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 52 U.S.P.Q.2d 1402 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000) (CLUE board game); *Board of Regents, University of Texas System ex rel. University of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 678 (W.D. Tex. 2008) (University of Texas "longhorn" logo); *Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.*, 238 F.3d 378, 57 U.S.P.Q.2d 1561 (5th Cir. 2001) (WE'LL PICK YOU UP slogan for Enterprise auto rental)

In sum, the Court concludes that TimberStone Management failed to establish the high degree of fame demanded for purposes of a trademark dilution claim. To the extent that the TIMBERSTONE mark has achieved any recognition, it is within the niche golfing market, rather than the general consuming public. However, niche fame is insufficient as a matter of law to support a dilution claim. TIMBERSTONE does not enjoy the status of a household name or "widespread recognition among the general consuming public." Given the clear lack of evidence to sustain a finding of "fame," the Court concludes that the jury reached a seriously erroneous result in finding for TimberStone Management on its trademark dilution claim. A new trial on this claim is warranted.[9]

---

[9] The Court would observe that upon a retrial, if the evidence of the "famousness" of the TIMBERSTONE mark is no more compelling that at the first trial, it would be hard-pressed not to grant a Rule 50(a) Motion for Judgment as a Matter of Law on the trademark dilution claim at the conclusion of TimberStone Management's case-in-chief. Indeed, the Court would have granted IGPI's Rule 50(b) motion on that issue had it been properly preserved as part of the IGPI's Rule 50(a) motion.

**B.** *Unfair Competition and False Designation of Origin*

IGPI also argues that a new trial is required on Count II, Unfair Competition and False Designation of Origin, 18 U.S.C. § 1125(a), because there was insufficient evidence to support the jury's finding of a "likelihood of confusion" and the jury's special verdict was irreconcilably inconsistent. The Court disagrees that a new trial is warranted on this claim.

### (1) Inconsistent Jury Verdict

According to IGPI, the jury could not reasonably have found in favor of TimberStone Management on the unfair competition claim where it found against TimberStone Management on its federal and common law trademark infringement claims, because all three claims involve a likelihood of confusion analysis. Dkt. 122 at 10.

The Supreme Court has held that trial courts have a duty to harmonize seemingly inconsistent answers to special verdict interrogatories "if it is possible under a fair reading of them." *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963). A court may not order a new trial until it "attempt[s] to reconcile the jury's findings, by exegesis if necessary." *Id.* "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962).

Here, Question 1 on the Special Verdict form asked: "Did TimberStone Management prove each element of its claim for federal trademark infringement by a

preponderance of the evidence [See Instruction No. 11.0-11.4]?" The jury answered "NO" and was therefore instructed to skip Question 2 as to whether IGPI proved its affirmative defense of "continuous prior use." *See* Dkt. 117-1 at 2. Question 4 asked the same regarding TimberStone Management's common law trademark infringement claim. The jury answered "NO" to this question as well, and was directed to skip Question 5 as to the continuous prior use defense. Finally, Question 6 asked whether TimberStone Management proved its claim of unfair competition and false designation of origin. This time, the jury answered "YES."

IGPI contends that the jury's answers of "NO" to Questions 1 and 4 demonstrate that TimberStone Management failed to prove the "likelihood of confusion" element of its prima facie claims for federal and common law trademark infringement. If this were the case, it would be difficult to reconcile the jury's finding on Question 6 that TimberStone Management had proven its claim for unfair competition and false designation of origin, as this claim also requires a showing of "likelihood of confusion."

The apparent inconsistency between the jury's answers to Special Verdict Questions 1, 4 and 6 can be explained by reviewing the jury instructions for each claim. Jury Instruction No. 11.0 (Federal Trademark Infringement) directed as follows: "If you find that Idaho Golf Partners has proven its affirmative defense by a preponderance of the evidence, *then you should find for Idaho Golf Partners on the claim for federal trademark infringement*." Dkt. 116 (emphasis added). A similar directive is found in Instruction No. 12.0, on Common Law Trademark Infringement. *Id.* In contrast, Jury

Instruction No. 13, on Unfair Competition and False Designation of Origin, establishes no such prior use defense. *Id.*

A reasonable juror could have interpreted Instruction Nos. 11.0 and 12.0 as a directive to incorporate the prior use defense into the answers to Special Verdict Questions 1 and 4. That is, a reasonable juror might have answered "NO" to Questions 1 and 4 if IGPI established its affirmative prior use defense, even if TimberStone Management had satisfied all elements of its prima facia claim.

Question 6 is unique in that the jury was not instructed on a prior use defense for the claim of unfair competition and false designation of origin. With that in mind, the apparent inconsistency between the answers to Questions 1, 4, and 6 is easily resolved. Drawing all reasonable inferences in TimberStone Management's favor, the jury found that TimberStone Management had established its prima facie case, including "likelihood of confusion," on all three claims—federal trademark infringement, common law trademark infringement, and unfair competition and false designation of origin. However, the jury found that IGPI had proven its affirmative defense of continuous prior use and therefore answered "NO" to Questions 1 and 4, even though TimberStone Management made out its prima facie case. Because the jury was not instructed on a prior use defense for the unfair competition claim, it answered "YES" to Question 6. Accordingly, the Court finds that there is no internal conflict in the jury's verdict.

### (2) Likelihood of Confusion

IGPI also appears to argue that the jury could not have found for TimberStone

Management on its unfair competition claim because there was insufficient evidence of any "likelihood of confusion." *See* Dkt. 122 at 10. A party claiming unfair competition must establish that the purported infringer's use of the mark is likely to cause consumer confusion. 15 U.S.C. § 1125(a). In determining whether there is likelihood of consumer confusion, courts within the Ninth Circuit apply an eight-factor test introduced in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979). The *Sleekcraft* factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.*

Several factors weigh heavily in favor of a "likelihood of confusion" here. First, as for similarity of the marks, both golf courses utilize the exact same name spelled the exactly the same way. They also sell identical goods. "Placing an identical mark on identical goods creates a strong likelihood of confusion." *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 862 F.3d 1131, 1133 (9th Cir. 2017); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.")

Both parties rely heavily on social media and other online marketing to promote their courses. Finally, TimberStone Management put forth several instances of actual customer confusion. Multiple TimberStone Management employees testified as to golfers

calling the wrong course, showing up for a tee time that they mistakenly reserved with the Idaho course, or posting information about the Idaho course on the Facebook page for the Michigan course (and vice versa). IGPI employees also testified that at least a dozen people have called their course trying to reach TimberStone of Michigan.

Having considered all of the factors, the Court concludes that there was sufficient evidence of "likelihood of confusion" such that the jury's finding for TimberStone Management on its unfair competition claim was not against the great weight of the evidence. IGPI's motion for a new trial on the unfair competition claim will be denied.

### C.      *Willfulness Verdict*

IGPI also seeks a new trial on the jury's finding that it infringed TimberStone's mark maliciously, fraudulently, or willfully, on two grounds. First, IGPI argues that because the jury did not find trademark *infringement*, it could not have found that IGPI *infringed* the TIMBERSTONE mark maliciously, fraudulently, or willfully. The Court disagrees. The jury was instructed: "[i]f you find for TimberStone Management on their federal or common law trademark infringement, unfair competition and false designation of origin, or dilution claims, you will also be asked to answer the following question on the Special Verdict Form: Did TimberStone Management establish by a preponderance of the evidence that Idaho Golf Partners infringed TimberStone Management's mark maliciously, fraudulently, or willfully?" Jury Instructions, No. 17, Dkt. 116. The jury found for TimberStone Management on two of these claims and thus properly proceeded to answer the question of willfulness.

Second, IGPI argues that there was insufficient evidence of maliciousness, fraudulence, or willfulness. Here too the Court disagrees and finds that the jury did not act against the weight of the evidence. The jury was instructed, without objection from either side, that "Idaho Golf Partners acted 'willfully' if it knew that it was infringing TimberStone Management's trademark or if it acted with indifference to TimberStone Management's trademark rights." *See* Jury Instructions, No. 17, Dkt. 116. At trial, both Travis and David Christensen testified that they were not aware of the TimberStone course in Michigan until TimberStone Management sent the cease and desist letter in April 2012. However, there is circumstantial evidence from which it may reasonably be inferred that IGPI learned about the Michigan course prior to the cease and desist letter. Most notably, Kelly Christensen testified that he found the URL www.timberstonegolfcourse.com when searching for a domain name on GoDaddy.com. He claimed that he never followed the link. Kelly Christensen also testified that he never performed a Google search for the word "TimberStone." A reasonable jury could have discredited such testimony and inferred that the Kelly Christensen, the director of marketing for the Idaho Golf Course, had come across some mention of the TimberStone course in Michigan. Additionally, the jury could have construed IGPI's subsequent failure to investigate TimberStone Management's rights to the TIMBERSTONE mark as evidence of indifference to those rights. The Court will therefore deny IGPI's Motion for New Trial as to the jury's finding of willfulness.

The Court feels compelled to add a final observation. The jury was instructed that

"Idaho Golf Partners acted 'willfully' if it knew that it was infringing TimberStone Management's trademark or if it acted with indifference to TimberStone Management's trademark rights." *See* Jury Instructions, No. 17, Dkt. 116. This instruction is a more lenient standard of willfulness that ordinarily employed in trademark cases. The Ninth Circuit has stated that "willfulness" should require some proof of the infringer's intent to profit from the reputation of the trademark holder. In *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993), for example, the Ninth Circuit held that to qualify as "willful," the infringement must be "willfully calculated to exploit the advantage of an established mark." *Id.* at 1406 (quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 921 (Fed. Cir. 1984)); *see also Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 847 (C.D. Cal. 2012) ("*Lindy Pen* requires at least a showing of trading on the mark holder's established name as part of the willfulness required.") In other words, mere knowledge of a competing trademark claim will not suffice to establish "willful infringement."

Even if the instruction on "willfulness" was erroneous in that respect, it does not warrant a new trial. IGPI did not contemporaneously object to the instruction, or object to the instruction in its post-trial briefing, and the error did not affect IGPI's substantial rights. The jury's finding of "willfulness" is merely advisory on this Court in determining the appropriate award of profits and damages. In reviewing the jury award, the Court will consider whether IGPI meets the higher standard of willfulness expressed in *Lindy Pen*, 982 F.2d 1400.

3.    **Damages**

The jury returned a verdict for TimberStone Management on its claims for unfair competition and trademark dilution and issued a lump-sum damages figure of $9,808. In resolving the pending motions, the Court must consider (1) whether there was sufficient evidence of damages to support the jury's verdict; (2) whether it should enhance the award.

A.    *IGPI's Request for Judgement as a Matter of Law due to Insufficient Evidence of Actual Damages*

IGPI seeks judgment as a matter of law on the issue of damages, arguing that TimberStone Management presented insufficient evidence as to actual damages and requests that the jury's award of actual damages in the amount of $9,808.00 should be vacated. As stated above, this claim is not procedurally barred as it was properly preserved in IGPI's Rule 50(a) motion.

Section 35(a) of the Lanham Act provides for monetary relief for a violation under sections 1125(a) and (b) or a willful violation under section 1125(c). 15 U.S.C. § 1117. A jury may award both (1) actual damages sustained by the plaintiff and (2) defendant's profits acquired through its infringing use.[10] *Id.* In reviewing a jury's damages award, the Court may "accept 'crude' measures of damages based upon reasonable inferences so

---

[10] The award of profits functions as a surrogate for actual damages, in recognition of the difficulty in proving actual diverted sales or injured reputation. *See BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994) (noting that profits may function as a "proxy for damages"); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992) (observing that profits are recognized as a "rough proxy" for damages, given the difficulty of "isolating the causation behind diverted sales and injured reputation").

long as those inferences are neither "inexorable . . . [nor] fanciful." *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993).

Here, TimberStone Management presented evidence under both methods: actual damages—in the form of lost sales, loss of goodwill, and the cost to correct consumer confusion—and IGPI's profits. The jury heard evidence regarding TimberStone Management's brand recognition and the tarnishing that occurs with being wrongly associated with a "bargain course." There was evidence that consumers accidentally booked tee times at the wrong course, suggesting that TimberStone Management may have lost potential sales due to customer confusion. Finally, TimberStone Management presented some testimony about the employee time spent dealing with consumer confusion and the potential cost of a corrective advertising campaign.

TimberStone Management also put forward evidence to support a profit award. The Lanham Act provides a relaxed evidentiary burden for establishing profits as a measure of damages: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117. In other words, once the plaintiff establishes the scale of defendant's sales bearing the infringing mark, the infringing party has the burden of disproving economic gain from the unlawful mark. Here, TimberStone Management presented evidence of IGPI's revenues over the relevant time period and therefore met its evidentiary burden to claim profits.

In sum, there was a legally sufficient evidentiary basis for a reasonable jury to

award TimberStone Management damages, such that judgment as a matter of law in IGPI's favor is not warranted.

**B.      *TimberStone Management's Request to Enhance Jury Award***

The Lanham Act "confers a wide scope of discretion" upon courts to adjust the amount of recovery awarded by a jury. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). Section 1117(a) provides, in relevant part, that a prevailing party

> shall be entitled, . . . *subject to the principles of equity*, to recover (1) defendant's profits [and] (2) any damages sustained by the plaintiff . . . . In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117 (emphasis added). Here, TimberStone Management requests that the Court award both treble damages and a higher measure of IGPI's profits. The Court considers each request in turn.

**(1)      Increased Profits**

As stated above, the Court has discretion to increase a profit award "[i]f the court shall find . . . the amount of the recovery . . . inadequate." 15 U.S.C. § 1117(a). In so doing, the must apply "principles of equity," *id.,* and ensure that the defendant "not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall." *Bandag, Inc. v. Al Bolster's Tire Stores, Inc.*, 750 F.2d 903,

918 (9th Cir. 1984)). "Awarding profits 'is proper only where the defendant is attempting to gain the value of an established name of another.'" *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073–74 (9th Cir.), *cert. denied*, 136 S. Ct. 410, 193 L. Ed. 2d 317 (2015) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993).

The evidence presented at trial showed that IGPI made over $3.7 million in gross revenues from 2011 to 2015 but accrued only $300,000 in profits over that period. TimberStone Management argues that it is entitled to the entire measure of IGPI's profits over the relevant period. However, there is no evidence that such profits were derived from IGPI's illegal conduct or, for that matter, that IGPI actually benefitted from its unlawful conduct. TimberStone Management alludes to IGPI having "profited handsomely" from its infringement but cites no supporting evidence. There is, for example, no evidence that IGPI customers purchased rounds of golf in Idaho based on their belief that the course was affiliated with the TimberStone of Michigan. Moreover, it strains reason to suggest that a customer might mistakenly golf a round in Idaho while believing herself to be at the Michigan course.

Finally, while the Court concluded above that there was sufficient evidence to support the jury's advisory finding of "willful" infringement, the Court does not agree that the evidence demonstrated any wrongful intent on the part of IGPI to profit from its unauthorized trademark use. The jury found that IGPI began using its mark in good faith—that is, without intent of profiting from the efforts of TimberStone Management

and without intending or reasonably anticipating confusion. This finding was reasonable, given the absence of any evidence of bad faith. Moreover, IGPI's subsequent refusal to stop using the mark after TimberStone Management's cease and desist letter was sent does not, standing alone, support the inference of subsequent bad faith. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 962 (7th Cir. 1992); *see also Straus v. Notaseme Hosiery Co.*, 240 U.S. 179, 181 (1916) ("[T]he defendants' persistence in their use of the design after notice proves little or nothing against them."). Therefore, the Court finds that IGPI's actions were not "willfully calculated to exploit the advantage of an established mark." *Lindy Pen*, 982 F.2d at 1406 (citation omitted).

"Awarding profits 'is proper only where the defendant is attempting to gain the value of an established name of another.'" *Fifty-Six Hope,* 778 F.3d at 1073–74 (quoting *Lindy Pen*, 982 F.2d at 1406). A careful examination of the record fails to reveal any evidence as to IGPI's actual or attempted gain from its infringing activity. Accordingly, the Court will decline to award profits above any amount that may be encompassed in the jury's lump-sum award.

### (2)    Treble Damages

Section 1117(a) provides that, "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." In a trademark case, "[t]he district court assesses 'any damages sustained by the plaintiff' in the same manner as in tort damages: the reasonably foreseeable harms caused by the wrong." *Skydive Ariz.,*

*Inc.*, 673 F.3d at 1112 (citation omitted).

Here, TimberStone Management claims actual damages in the form of lost sales, loss of goodwill, and the cost to correct consumer confusion. The evidence of lost sales here was minimal, at best. TimberStone Management presented no evidence of diverted sales. It stands to reason that the course lost sales to confused customers who booked tee times at the Idaho course. However, TimberStone Management employees testified that their ordinary practice was to attempt to simply rebook such customers.

TimberStone Management also claims that it has submitted records that "*detail the fact of harm to Defendant's reputation and goodwill." Def. Resp. to Pl. Post-Trial Brief* at 7, Dkt. 124 (emphasis added). The Court disagrees. TimberStone Management did present evidence supporting the quality of its course, customer goodwill, and recognition in the golf industry. TimberStone established instances of actual consumer confusion between the two courses, largely through misdirected calls and mistaken Facebook postings. There was also uncorroborated testimony from TimberStone Management employees of the brand tarnishing that *might* occur from being associated with the Idaho course.

However, TimberStone Management made no attempt to establish an actual, material loss of goodwill from confusion or the scope of any such harm. For example, there was no evidence that consumers believed the courses were affiliated or thought worse of the Michigan course after coming across photos or postings about the Idaho course. Nor does this case fit the paradigm scenario of lost goodwill from customer

confusion: a confused customer purchasing the infringer's goods, believing she was buying the goods of the trademark holder, then associating inferior characteristics of the former with the latter.

Finally, TimberStone Management presented some evidence as to corrective costs. James Webster, one of the co-owners of TimberStone Management, testified that his employees have spent time dealing with consumer confusion. However, there was no effort made to quantify the amount of employee time or its cost to the business. Moreover, while James Webster testified that it would cost $30,000 for TimberStone Management to run one month of corrective advertising in a national golf publication, such a measure is not reasonably tailored to the scope of confusion established at trial.

In sum, a careful examination of the record fails to reveal any evidence suggesting that TimberStone Management suffered greater actual harm than what is reflected in the jury's award.

The Court must also apply "principles of equity," in determining whether to award treble damages. The Third and the Fifth Circuits have identified several equitable factors to guide this decision, which the Court finds instructive. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir.2005); *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002). These include:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Quick Techs.*, 313 F.3d at 349 (internal quotation marks omitted).

Here, most of the factors weigh against trebling the damage award. As for (1) and (6), the Court found above that IGPI lacked any intent to confuse or deceive customers and did not attempt pass off its course as one affiliated with TimberStone of Michigan. Nor was there evidence that TimberStone Management's sales were actually diverted to IGPI, as would support factor (2). As for factor (3)—the adequacy of other remedies— the Court finds that an injunction would more appropriately correct any injury the plaintiff suffered in terms of the costs of corrective action. Factor (4) does not weigh heavily in either party's favor, as both TimberStone Management and IGPI were relatively prompt in seeking legal recourse. As for factor (5), while the public has a general interest in making trademark infringement unprofitable, no factors strengthen or distinguish that general interest in this case. Moreover, there is no evidence here that IGPI actually *profited* from its unlawful conduct. Therefore, the Court finds that trebling the amount of damages awarded by the jury is not necessary to fairly compensate TimberStone Management for the adverse effects of IGPI's infringement.

In sum, after a careful examination of the evidence of actual damages, and consideration of the equities in this case, the Court concludes that trebling the award of damages or awarding additional profits is not justified. The jury's award of $9,808 is a reasonable compensatory award when considering the minimal evidence of TimberStone Management's actual damages and lack of any evidence that IGPI actually profited from customer confusion between the two courses. TimberStone Management's request for enhanced recovery will be denied.

### C.        *Necessity of a New Trial on Damages*

The jury did not apportion its lump-sum damages award between the two claims on which TimberStone Management prevailed. Because the jury's verdict on trademark dilution must be set aside, the Court must also consider whether the jury's general damages award must be set aside and a new trial conducted on damages, out of concern that the damages were based in part on overturned claim.

It is well settled that where the jury returns a general verdict on multiple theories of liability, one of which is later found to be invalid, the general verdict must be reversed and a new trial ordered if the court cannot determine whether the verdict was based upon the invalid theory. *See United N.Y. and N.J. Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619 (1959) ("[A] new trial will be required" where "there is no way to know that [an] invalid claim . . . was not the sole basis for [a] verdict."); *McCord v. Maguire*, 873 F.2d 1271, 1273–74 (9th Cir.), *opinion amended on denial of reh'g*, 885 F.2d 650 (9th Cir. 1989). Where the verdict was not influenced by the overturned claims or theories, a new trial is not required. *See McCord*, 873 F.2d at 1274; *see also Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014) (collecting cases).

This so-called "general verdict" rule has been applied in cases where the jury issues a single damages award on multiple claims. In this context, federal courts have held that a lump-sum damages award must be vacated if the jury may have awarded a portion of the total damages exclusively for the claim or theory of liability that is later reversed. *See, e.g.*, *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494,

502 (8th Cir. 2010) (vacating a global damages award where the court had no way of knowing whether the jury awarded some portion of the award for a later-reversed claim). However, a new trial is unnecessary where one of the alternative claims fully sustains the damages awarded—that is, where the error did not affect the damages figure. *See e.g., Ondrisek v. Hoffman*, 698 F.3d 1020, 1026–27 (8th Cir. 2012) (holding that "the award should stand despite the erroneous submission of another theory, where the damages are the same under a properly submitted theory."); *Quigley v. Rosenthal*, 327 F.3d 1044, 1073–74 (10th Cir. 2003) (concluding that the damages award could stand because reversal on one of the counts "has no effect on the damages award," because the damages for each of the five claims were "the same.").

In this case, the jury was instructed that if it found for TimberStone Management on any of its federal or common law trademark infringement, unfair competition, or trademark dilution claims, it may award (1) actual damages, and (1) IGPI's profits. *See* Jury Instructions, No. 18.1, Dkt. 116. While the measure of damages was the same on each claim, trademark dilution is, at least in theory, "a separate legal theory positing a different kind of damage to a mark caused by a different form of consumer perception." 4 McCarthy on Trademarks and Unfair Competition § 24:72 (4th ed.). Federal antidilution law is aimed at protecting against a gradual whittling away of the selling power of a famous mark. *See id.* (collecting cases). In contrast, protections against trademark infringement are aimed at consumer mistake and deception, and the commercial damage it creates. *Id.*; *see also B & H Mfg. Co. v. Bright*, No. CVF016619AWISMS, 2005 WL

1342815, at *13 (E.D. Cal. May 10, 2005) (upholding separate jury award for dilution and infringement).

Whether the jury picked up on this subtle difference is debatable. TimberStone Management made no effort at trial to point out unique damages attributable to dilution. It's possible, therefore, that the general damages award would have been supported by finding of liability on the unfair competition claim alone.

However, given this uncertainty, the Court feels compelled to require that the issue of damages on both claims be re-submitted to a jury. Thus, at a new trial, the jury will be required to decide both IGPI's liability for trademark dilution and what, if any, damages were suffered by TimberStone Management on that claim, as well as the unfair competition claim. On the other hand, it strikes the Court that only IGPI would be prejudiced by upholding the general verdict award if those damages may have been awarded by the jury based upon the trademark dilution claim. Therefore, it would appear appropriate to offer IGPI the option of accepting the jury's general damages award as the measure of damages on the unfair competition claim and proceeding to a new trial only as to liability and damages on the trademark dilution claim.

**4.      TimberStone's Request for Attorneys' Fees and Costs**

Because the Court has determined that a partial new trial is required, and to avoid addressing fee issues in a piecemeal fashion, the Court will reserve ruling on TimberStone Management's request for attorneys' fees and costs. TimberStone Management may supplement its motion for fees and costs, as appropriate, after the new

trial.

## CONCLUSION

For the reasons states above, the Court will deny IGPI's Motion for Judgment as a Matter of Law. However, given the insufficiency of the evidence of TIMBERSTONE's fame, a partial new trial is warranted on the trademark dilution claim. The jury will be asked to decide IGPI's liability on the trademark dilution claim and what, if any, damages were suffered by TimberStone Management on that claim, as well as the unfair competition claim. IGPI will have the option of accepting the jury's general damages award as the measure of damages on the unfair competition claim and proceeding to a new trial only as to liability and damages on the trademark dilution claim. The Court will reserve ruling on TimberStone Management's request for attorney's fees and costs until any new trial proceedings are completed.

A separate order will issue addressing IGPI's request for a declaratory judgment and TimberStone Management's request for injunctive relief. Each party may submit proposed findings of fact and conclusions of law on these issues or before September 8, 2017. Although the Court is inclined to issue a limited permanent injunction, the terms proposed by Plaintiff are far too broad, given the jury's finding that IGPI established its good faith remote use defense. However, the Court would be inclined to require IGPI to take reasonable steps to avoid any further confusion, such as monitoring its social media pages for misdirected consumer postings, modifying its mark to clearly designate its location in Idaho, and other terms as the parties may agree upon and the Court find just.

Accordingly, the parties shall also meet and confer for purposes of drafting mutually-agreeable terms for a permanent injunction. Their proposed injunction shall be filed on or before September 15, 2017. If the parties cannot reach agreement, each party shall file its own proposed injunction.

## ORDER

**IT IS HEREBY ORDERED THAT**:

1.  IGPI's Motion for Judgment as a Matter of Law (Dkt. 122) is **DENIED**.

2.  IGPI's Motion for a New Trial (Dkt. 122) is **GRANTED IN PART** and **DENIED IN PART**.

    a.  The Motion is **GRANTED** as to TimberStone Management's trademark dilution claim (Count III) and as to damages on the unfair competition claim (Count II). However, IGPI will have the option of accepting the jury's lump-sum damages award as the measure of damages for unfair competition and proceeding to a new trial only on trademark dilution.

    b.  The Motion is otherwise **DENIED**.

3.  TimberStone Management's request for enhanced jury damages is **DENIED**.

4.  The Court reserves ruling on TimberStone Management's request for attorney's fees and costs.

5.  The Court will enter a separate notice scheduling a status conference for the purpose of choosing a date for the new trial.

6.  Each party may, on or before **September 8, 2017**, submit proposed findings of fact and conclusions of law on the declaratory judgment and injunctive relief issues.

7.  The parties shall meet and confer for purposes of drafting mutually-agreeable terms for a permanent injunction. Their proposed injunction shall be filed on or before **September 15, 2017**. If the parties cannot reach agreement, each party shall file its own proposed injunction.

DATED: August 17, 2017

B. Lynn Winmill
Chief Judge
United States District Court